AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means (USAO Rev. 12/20)

# UNITED STATES DISTRICT COURT

for the

Central District of California

In the Matter of the Search of the Person of William Breveard, as described further in Attachment A-2

)
)
)
)
)
)
)
)

Case No.  2:25-MJ-7763

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

*See Attachment A-2*

located in the Central District of California, there is now concealed:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| *See attached Affidavit* | |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

/s/ *Eric Chin*

*Applicant's signature*

Special Agent, Eric Chin

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____

*Judge's signature*

City and state:  Los Angeles, CA

Honorable Patricia Donahue, U.S. Magistrate Judge

*Printed name and title*

AUSA: Yervant P. Hagopian – x0732

<u>**ATTACHMENT A-2**</u>

<u>**PERSON TO BE SEARCHED**</u>

An individual named William Gary Breveard ("BREVEARD"), whose date of birth is November 28, 1991.  National Crime Information Center records indicate BREVEARD is five feet, ten inches tall, weighs 155 pounds, and has black hair and brown eyes.

The search of BREVEARD shall include any and all clothing and personal belongings, digital devices, backpacks, wallets, briefcases, purses, folders, bags, and other containers carried or held by BREVEARD, or that are within BREVEARD's immediate vicinity and control.  The search shall not include a strip search or a body cavity search.

A picture of BREVEARD is as follows:



.

**ATTACHMENT B**

**I.    ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 1030 (Fraud and Related Activity in Connection with Computers), 1343 (Wire Fraud), 1344 (Bank Fraud), 1349 (Wire and Bank Fraud Conspiracy), 1956 and 1957 (Money Laundering and Money Laundering Conspiracy), and 371 (Conspiracy) (the "Subject Offenses"), including:

2.    Evidence of business email compromise;

3.    Evidence of the unlawful access to computer systems;

4.    US currency, foreign currency, cryptocurrency, or other financial instruments and other evidence of unexplained and/or excessive wealth, including precious metals and stones, jewelry, negotiable instruments, money orders, cashier's checks, financial instruments, and title documents;

5.    Records receipts, books, notes, bank statements and other bank documents such as deposits slips and withdrawal records, business records, passbooks, safes, and records of safety deposit boxes and storage lockers including keys;

6.    Correspondence, documents and computer or electronic devices (and their contents) containing data reflecting or memorializing the communication and contact information of victims and co-conspirators, and flow of money related to fraud schemes, including address books, pay-owe sheets, records of bank transactions, log books, ledgers, banking documents,

1

financial records, storage records, receipts, spreadsheets, rolodexes and electronic organizers;

7.    Photographs and electronic images, such as video recording and tape recordings (and their contents) which document the association with other co-conspirators and/or which direct the defrauding of victims and transfer of money and assets;

8.    Items of personal property that tend to identify the possession, control or ownership of the SUBJECT PREMISES such as vehicle title, corporation records, mail, leases, rental agreements, photographs and videos, personal telephone books, diaries, utilities and telephone bills, statements, identification documents, and keys;

9.    Documents and articles of false personal identification to include government identification cards, credit cards, check books, bank records, travel documents, passports, birth certificates, driver's licenses, immigration cards, and other forms of identification in which the same person would use other names and identities other than his or her own;

10.    Mail, parcels, packages, and documents pertaining to the purchase, sale, tracking, delivery, or distribution of mail consignment;

11.    Cellular/mobile phones (and their contents), and other communication devices (i.e. iPhone, Android phones, iPads, and the like) may be seized and searched for the following items:

a.   Assigned telephone number and identifying serial numbers (e.g., ESN, MIN, IMSI, IMEI)

b.   Stored lists of received, sent, or missed calls;

c.   Stored contact information;

d.   Stored files (including photographs and videos) displaying or accounting for currency, banking transactions, cashier's checks, financial records, shipping information, mail, evidence, of the aforementioned offenses, and/or that may show the user of the phone or communication device and/or co-conspirators, including any embedded GPS data associated therewith;

e.   Stored text messages, as well as any messages in any internet messaging aps, including but not limited to Facebook Messenger, iMessage, Wickr, Telegram, Signal, WhatsApp, Kik, and similar messaging applications related to the aforementioned cries of investigation or that may show the user of the phone and/or co-conspirators, including Apple iMessage, Blackberry Messenger messages or other similar messaging services where the data is stored on the telephone;

f.   Evidence of user attribution showing who used or owned the cell phone at the time the items described in this warrant were created, edited, or deleted, such as slogs, phonebooks, saved usernames and passwords, and documents;

g.   Records and information evidencing bank transactions and opening or closing bank accounts;

h.   Records of Internet Protocol (IP) addresses used;

i.    Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user typed web addresses.

12.  Digital devices, such as computers, tablets, and other electronic storage media such as USBs and external hard drives, may be seized and searched for the following items, in addition to the materials set for above:

a.    Evidence of who used, owned, or controlled the digital device or other electronic storage media at the time the things described in this warrant were created, edited, deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, "chats," instant messaging logs, photographs, and correspondence;

b.    Evidence of the attachment to the digital device or other storage devices or similar containers for electronic evidence;

c.    Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the digital device or other electronic storage media;

d.    Evidence of the times the digital device or other electronic storage media was used;

e.    Passwords, encryption keys, and other access devices that may be necessary to access the digital device or other electronic storage media;

f.    Contextual information necessary to understand the evidence described in this attachment;

13.    The search of computer/digital devices and/or their components as set forth herein is specifically authorized by this search warrant, not only to the extent that such digital devices constitute instrumentalities of the criminal activity described above, but also for the purpose of conducting off-site examinations of their contents for evidence, instrumentalities, or fruits of the aforementioned crimes.

## II.    SEARCH PROCEDURE FOR DIGITAL DEVICES

14.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed one year from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this one year period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the scope of items to be

seized, the government may make and retain copies of such data
and may access such data at any time.

       f.  If the search determines that a digital device is
(1) itself an item to be seized and/or (2) contains data falling
within the scope of other items to be seized, the government may
retain the digital device and any forensic copies of the digital
device, but may not access data falling outside the scope of the
other items to be seized (after the time for searching the
device has expired) absent further court order.

       g.  The government may also retain a digital device
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),
including in circumstances where the government has not been
able to fully search a device because the device or files
contained therein is/are encrypted.

       h.  After the completion of the search of the digital
devices, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

    15.  The review of the electronic data obtained pursuant to
this warrant may be conducted by any government personnel
assisting in the investigation, who may include, in addition to
law enforcement officers and agents, attorneys for the
government, attorney support staff, and technical experts.
Pursuant to this warrant, the investigating agency may deliver a
complete copy of the seized or copied electronic data to the

custody and control of attorneys for the government and their
support staff for their independent review.

16.   During the execution of this search warrant, law
enforcement is permitted to: (1) depress BREVEARD's thumb and/or
fingers onto the fingerprint sensor of the device (only when the
device has such a sensor), and direct which specific finger(s)
and/or thumb(s) shall be depressed; and (2) hold the device in
front of BREVEARD's face with his or her eyes open to activate
the facial-, iris-, or retina-recognition feature, in order to
gain access to the contents of any such device.  In depressing a
person's thumb or finger onto a device and in holding a device
in front of a person's face, law enforcement may not use
excessive force, as defined in Graham v. Connor, 490 U.S. 386
(1989); specifically, law enforcement may use no more than
objectively reasonable force in light of the facts and
circumstances confronting them.

17.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

**AFFIDAVIT**

I, ERIC CHIN, being duly sworn, declare and state as follows:

## I.    PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of an application for a warrant to authorize a search of:

a.    The residence located at 6001 Carlton Way, Apt 204, Los Angeles, California 90028 ("SUBJECT PREMISES"), and any digital devices recovered therein, as further described in Attachment A-1; and

b.    The person of William Gary Breveard ("BREVEARD"), and any digital devices recovered thereon, as further described in Attachment A-2.

2.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 1030 (Fraud and Related Activity in Connection with Computers), 1343 (Wire Fraud), 1344 (Bank Fraud), 1349 (wire fraud and Bank Fraud Conspiracy), 1956 and 1957 (Money Laundering and Money Laundering Conspiracy), and 371 (Conspiracy) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, and B are fully incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law-enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all my knowledge of or investigation

into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

## II.  <u>BACKGROUND OF AFFIANT</u>

4.    I, Eric Chin, am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigation ("HSI"), and have been so employed since March 2019.  I am currently assigned to the HSI Seattle Office.  In this capacity, I investigate federal criminal violations including, but not limited to, cybercrimes, money laundering, wire fraud, bank fraud, commercial fraud, theft, intellectual property crimes, and organized criminal activity.  I have received training in the areas of computer networks, security policies, incident response, cyber security terminology, and cryptocurrencies.  I hold Global Information Assurance Certification (GIAC) certifications in Information Security Fundamentals, and Network, Endpoint, Open-Source Intelligence, and Cloud Security Essentials.  Also, I have received a Cisco Certified Network Associate certification.  Among other things, I have experience obtaining and executing search warrants for various types of online accounts and reviewing electronic device evidence related to business email compromise (BEC).  These types of electronic evidence included email accounts, computers, and cellphones which revealed BEC suspects' techniques such as online reconnaissance of victims, creating burner accounts and identities to obfuscate suspect identities, purchasing phishing

2

kits from online vendors, maintaining virtual servers to enable phishing campaigns, utilizing cryptocurrencies to launder victim proceeds and pay suspects' commissions, and communicating discretely about criminal activities via email or third party applications.

5. Prior to becoming a Special Agent with HSI, I was employed as a Special Agent with the United States Drug Enforcement Administration ("DEA") for approximately three years. In this capacity, I investigated violations of the Controlled Substances Act, Title 21, U.S.C., § 801, et seq., and related offenses. Investigations and search warrants which I actively participated on as a DEA agent involved international money laundering, wire fraud, bank fraud, and narcotics smuggling and trafficking. I have also received comprehensive training in money laundering methods, narcotics smuggling tactics, and techniques to process physical and electronic search warrants.

### III. BACKGROUND ON BUSINESSS EMAIL COMRPOMISE AND MONEY LAUNDERING

6. A Business Email Compromise ("BEC") scheme is a sophisticated scam targeting businesses that regularly perform wire transfer payments. The scam is carried out by compromising legitimate business email accounts through social engineering or computer intrusion techniques to further the unauthorized transfer of funds.

7. In my training and experience, I know that BEC actors, which include those who social engineer victims or compromise

victims' computer systems, often work with a network of money launderers, commonly referred to as "money mules", to move fraudulent BEC proceeds through domestic bank accounts to overseas bank accounts or cryptocurrency exchanges. This allows the BEC actors to profit from their fraudulent conduct and avoid detection. Money launderers recruit others to use multiple bank accounts to move money in a series of convoluted transactions that makes it harder to identify the source of funds. This is often referred to as "layering" or "funneling."

8. The use of "money movement" relating to bank accounts ("movement accounts") to layer or funnel fraud proceeds works as follows:

a. Prior to the fraud scheme being perpetrated, a money launderer is recruited to open a movement account. Sometimes, a money movement account may be opened months in advance to allow a "cooling off period", as financial institutions may scrutinize high-value transactions made to newly opened bank accounts.

b. The movement account receives proceeds from the BEC fraud.

c. The money launderer, or another individual involved in the BEC fraud, will transact in various ways, such as withdrawing large amounts of cash from the movement account, using checks or ACH/wire transfers. Often, the beneficiaries of the transactions are other movement accounts, an overseas bank account or cryptocurrency exchange.

9.    Suspected money launderers often open fictitious or "sham" companies that have no true business purposes so they can open bank accounts in the name of those businesses.  This use of a business entity and its bank accounts further attenuates the link between the fraud funds, their illegal source, and the ultimate recipients of the funds.  Suspected money launders may also steal another individual's identity to establish the "sham" companies and bank accounts.

10.   Based on my training and experience, I know California Secretary of State ("SOS") mails correspondence to businesses at their listed mailing address such as formation documents, entity numbers, and periodic statements.  I also know that financial institutions mail correspondence to individuals at their address regarding account statements, changes in terms, security alerts, promotional offers, debit and credit cards, check books, and other notices.

11.   Based on my training and experience, I know that money launderers use digital devices to communicate about the transfer of illicit funds, capture and send photos as proof of payment, send messages using text and encrypted phone applications, and conduct phone calls with co-conspirators in furtherance of crimes.  Based on my training and experience, I know that money launderers store their digital devices at their residences.

12.   Based on my training and experience, money launderers possess IDs, debit cards, credit cards, and unlawful proceeds on their persons.

## IV.    SUMMARY OF PROBABLE CAUSE

13.    The present investigation involves a BEC scheme that targeted at least five victims for approximately $52 million. In January 2025, a business entity and two of its owners transferred approximately $45 million to a Citibank account thinking that the recipient was an escrow company.  Of that, approximately $973,000 later transferred to a Wells Fargo account; BREVEARD created the Wells Fargo account, listed the SUBJECT PREMISES as the address, and is depicted on bank surveillance footage withdrawing money from the account. BREVEARD used false identities to create other shell companies and bank accounts, some of which also listed the SUBJECT PREMISES, to receive additional BEC proceeds in the amount of approximately $7 million.

## V.    STATEMENT OF PROBABLE CAUSE

### A.    BREVEARD Withdrew BEC Proceeds at the Bank

14.    According to information provided by victims to the United States Secret Service, between January 10 and 15, 2025, a corporate victim in California ("Victim-1") and its two owners, M.M. and N.I., sent over $45 million to Citibank account ending 5352 ("Citibank x5352") believing they were transferring the amount to an Escrow company (the "Escrow Company") to purchase a luxury home.  Around December 2024, the Escrow Company's email account was breached and a user impersonating an employee, emailing from an account that appeared to be an Escrow Company account but was in fact not, directed M.M. and N.I. to wire the escrow amount to Citibank x5352.

15.  Based on bank records, Citibank x5352 is held in the name of Transpo Express LLC ("Transpo").  Apart from de-minimus transactions (e.g. opening deposit in the amount of $100), all transactions from Citibank x5352 involved BEC proceeds.

16.  Between January 13 and 15, 2025, Citibank x5352 transferred approximately $50.75 million[1] in purported payroll, credits, and payments.  Of that, on January 13, 2025, Transpo made a $973,765 payment from Citibank x5352 to a Bank of America account ending 7599 ("BOA x7599") held in the name of Terebeck IT LLC ("Terebeck IT"); in turn, on January 15, 2025, Terbeck IT's Wells Fargo account ending 6775 ("WF x6775") received a transfer in the same amount.  Based on my training and experience, I believe the movement of $973,765 between at least three bank accounts within two days was an attempt by the owner of Terebeck IT to clean the illicit proceeds prior to receipt.

17.  According to bank records, on November 18, 2024, Joseph Terebecki, as sole signatory, opened WF x6775 and listed himself as the owner of Terebeck IT and 6001 Carlton Way, Apartment 204, Los Angeles, California 90028 (the "SUBJECT PREMISES") as his residence.

18.  Based on bank records, between January 16 and 17, 2025, approximately $579,376.00 of traced BEC Proceeds were withdrawn from WF x6775; surveillance footage identified a black adult male conducting the following withdrawals:

---

[1] The debits totaled approximately $50.75 million which was approximately $5.6 million more than M.M., N.I., and Victim-1's losses, which excess was comprised of credits back to the account when transfers were not successfully received by the beneficiary bank.





1/16/25 ATM Footage
Withdrawing $100

1/17/25 Teller Footage
Withdrawing $43,000

19.   BREVEARD's passport, driver license, and publicly viewable Facebook photographs are as follows:



20.   BREVEARD resembles the individual depicted on bank surveillance footage withdrawing from WF x6775.  Further,

8

BREVEARD's criminal history includes two arrests for false identification and theft-related crimes. Meanwhile, investigators searched Terebecki's identity through government databases but found no results. As such, and based on my training and experience, I believe BREVEARD used Terebecki as an alias to commit BEC fraud.

      **B.**    **BREVEARD Resides at the SUBJECT PREMISES**

21. A public records search for individuals connected to the SUBJECT PREMISES uncovered BREVEARD, Michael Perks, and Liam Smith.

22. Investigators searched Perks' identity but found no results. Based on public records, Smith was born November 28, 1991, which matches BREVEARD's date of birth. Based on my training and experience, I believe Perks and Smith are also BREVEARD's aliases.

23. Based on SOS documents, in October and November 2024, Terebecki incorporated Perks PPC LLC ("Perks PPC") and Terebeck IT, respectively, which were both located at the SUBJECT PREMISES. In December 2024 and February 2025, Terebecki and Perks respectively made payments to SOS on behalf of Terebeck IT. The latter payment listed the SUBJECT PREMISES as the billing address. SOS records also indicated the nature of Terebeck IT's business was to "provide clients with hardware and software installations and equipment." Based on my training and experience, I know perpetrators of BEC schemes use computers and other digital devices to compromise BEC victims' email accounts through social engineering or technical computer intrusion

9

methods and ultimately trick victims into sending money to fraudulent bank accounts. As a result, I believe computers and other digital devices would be found during the search of the SUBJECT PREMISES, which may yield evidence of BREVEARD conducting the BEC scheme.

24. In 2019, BREVEARD established Forever Known LLC, which owned a Truist bank account ending 0174 ("Truist x0174") with BREVEARD as the listed signatory. Based on bank statements and BEC victim interviews, on August 8, 2023, Truist x0174 received $7 million in known BEC proceeds from Hannah Instruments Inc.

25. According to online banking activity records, a user accessed Truist x0174 via a mobile device approximately eleven times between July 18 and August 9, 2023. It should be noted that following Hanna Instruments' payment of $7,000,000 to Truist x0174 on August 8, 2023, a user logged into the account six times in short succession indicating that the user was monitoring the BEC payment.

| Login Time (GMT) | Login Method |
|---|---|
| 7/18/2023 18:01 | Mobile device |
| 7/21/2023 11:31 | Mobile device |
| 7/24/2023 13:24 | Mobile device |
| 7/31/2023 18:12 | Mobile device |
| 8/4/2023 18:14 | Mobile device |
| 8/8/2023 17:02 | Mobile device |
| 8/9/2023 10:43 | Mobile device |
| 8/9/2023 15:44 | Mobile device |

| 8/9/2023 16:29 | Mobile device |
| --- | --- |
| 8/9/2023 17:48 | Mobile device |
| 8/9/2023 17:48 | Mobile device |

Based on the facts of the investigation and my training and experience, I believe BREVEARD used digital devices such as mobile phones in furtherance of the BEC scheme to receive defrauded proceeds.

26.  In July 2025, based on passport records, HSI investigators saw BREVEARD depart Los Angeles International Airport after midnight and enter the apartment complex that contains the SUBJECT PREMISES.  Based on my training and experience, travelers who land at an airport after midnight are likely to go directly to their residence.

27.  On July 28, 2025, law enforcement reviewed international shipping records for parcels addressed to or from the SUBJECT PREMISES and identified four international parcels where the recipient or sender was Smith, Perks, or BREVEARD.

28.  For all of the foregoing reasons, I believe BREVEARD's primary residence is the SUBJECT PREMISES and there is probable cause to search the SUBJECT PREMISES.

### VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

29.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units;
*(footnote cont'd on next page)*

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently

---

desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

30.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of

electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

31. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked

14

for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

      c.   Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress BREVEARD's thumb and/or fingers on the
device(s); and (2) hold the device(s) in front of BREVEARD's
face with his  open to activate the facial-, iris-, and/or
retina-recognition feature.

32.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

**VII. <u>CONCLUSION</u>**

33.  For all of the reasons described above, there is
probable cause to believe that evidence of the Subject Offenses
described in Attachment B will be found in a search of the
SUBJECT PREMISES and BREVEARD's person, as described in
Attachments A-1 and A-2, respectively.

_____
Eric Chin, Special Agent
Homeland Security
Investigations


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
August, 2025.


_____
HONORABLE
UNITED STATES MAGISTRATE JUDGE

16